SALVATORE SIMONELLI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Simonelli v. Commissioner
Docket Nos. 8210-78, 30883-81.
United States Tax Court
T.C. Memo 1985-12; 1985 Tax Ct. Memo LEXIS 617; 49 T.C.M. (CCH) 469; T.C.M. (RIA) 85012; January 9, 1985. *617 Held, P underreported gross receipts from his sand and gravel business during 1971 through 1975; Held further, P underreported or failed to report interest income, rental income and capital gain income in some of the years in issue; Held further, that of the two unexplained deposits in 1974 totaling $100,768.31, $768.31 represents taxable income, the remaining $100,000 being a nontaxable transaction; Held further, P had a cash hoard, $1,000 of which was deposited to his bank accounts during each of the years 1973, 1974 and 1975; Held further, P is entitled to additional business expenses not claimed on his 1971 return in the amount of $5,000; Held further, P is not entitled to an additional cost basis beyond that determined with respect to land sold in 1972; Held further, fraud not proven by clear and convincing evidence in the circumstances of this case where P was suffering severe mental disorders; and Held further, P is liable for the addition to tax for negligence under section 6653(a) for the years 1972 through 1975. Allen B. Pearl, for the petitioner. Caroline R. Ades and Matthew Magnone, for the respondent. DRENNEN MEMORANDUM FINDINGS OF FACT AND OPINION DRENNE, Judge: This *618 case was assigned to and heard by Sepecial Trial Judge Peter J. Panuthos pursuant to the provisions of section 7456(c) [1], and General Order No. 8 of this Court, 81 T.C. XXIII (1983). After review of the record, we agree with and adopt his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PANUTHOS, Special Trial Judge: Respondent determined deficiencies and additions to tax in petitioner's Federal income tax for the taxable years 1971, 1972, 1973, 1974 and 1975 in the following amounts: Docket No. 8210-78
Addition to Tax
Year
Deficiency
Sec. 6653(b)
1971
$47,020.42
$23,510.21
Docket No. 30883-81
Additional to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(b) [2]
1972
$28,847.66
$1,442.38
$14,423.83
1973
$66,521.82
$3,326,09
$33,260.91
1974
$76,036.94
$3,801.85
$38,018.47
1975
$35,128.21
$1,756.41
$17,564.11
By order dated May 10, *619 1983, these cases were consolidated for trial, briefing and opinion. After concessions by the parties, the issues remaining for decision are: (1) Whether petitioner had unreported income for each of the years in issue as determined by respondent or in some lesser amount; (2) Whether petitioner is liable for the additions to tax for fraud under section 6653(b) for the years in issue; and (3) If the Court finds that petitioner is not liable for the addition under section 6653(b) for fraud, whether part of the underpayment of tax for the taxable years 1972 through 1975 was due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). Some of the facts have been stipulated and found accordingly. At the time of filing the petitions in this case, petitioner resided in Madison, New Jersey. The parties have agreed that the assessment and collection of the deficiencies are not barred by the statute of limitations. [3] *620 Accordingly, the notices of deficiency were timely issued in this case. FACTUAL BACKGROUND.
During the years in issue, petitioner was in his mid-fifties. Petitioner suffered severe bodily injuries as a child (at about age 14) which resulted in chronic physical and mental handicaps. As a result of these injuries, petitioner left school before completing the seventh grade. Petitioner's work experience consisted of farming, selling building materials, and repairing trucks. Sometime around 1953 petitioner began his own business which consisted of selling cinder blocks, sand and gravel. Petitioner was involved in this activity in the years 1971 through 1975 as a sole proprietor. The business was operated from his residence located at 27 Elm Street, Madison, New Jersey. During the years in issue, Lyle Maines, his wife Susan Maines and their four children resided with petitioner. Petitioner had one telephone which was used for both business and personal purposes. As a general matter, petitioner's customers placed their orders by telephone. Occasionally an *621 order would be given to the truck driver, Lyle Maines, upon making a delivery. When an order was received from a customer, petitioner's truck driver would pick up a load of blocks from a supplier, one of which was located in Wyoming, Pennsylvania, approximately 300 miles roundtrip from petitioner's residence. Petitioner dealt with this supplier since he believed that he received a better price than from other suppliers. Petitioner's driver would then deliver the supplies, e.g., cinder blocks, sand or gravel to one of petitioner's customers. Petitioner knew all of his customers personally. The merchandise was delivered to the customer within a few days after the order was placed. Deliveries were punctual and loads were complete with few shortages. Customers were billed either after delivery or at the end of the month. Sometimes bills were delivered to the customer upon delivery of the merchandise. Normally petitioner would set a price upon the initial contact with the customer. Any upcoming increases in prices would be noted by petitioner on bills sent to the customer. Recordkeeping and Return preparation.
Rose Kyle, petitioner's cousin, prepared the 1971 through 1975 income *622 tax returns. She had prepared petitioner's tax returns for prior years. She also prepared returns for other members of petitioner's family. Petitioner provided Mrs. Kyle with a sheet of paper for each year listing items of income and an itemized list of expenses. Petitioner did not provide any books or records, 1099 Forms, or any bank statements to Mrs. Kyle for the preparation of his returns. Mrs Kyle did not prepare or maintain books and records for petitioner's business. Mrs. Kyle believed that the information provided to her by petitioner on the sheets of paper accurately reflected petitioner's income and expenses for the respective years in issue. In December of 1975 a special agent of respondent interviewed petitioner and requested records relating to petitioner's business activity. Petitioner advised the special agent that he would turn over his records at a future date. The special agent was later advised by petitioner's accountant that no records would be forthcoming. Petitioner testified that he put his records in a cardboard box and periodically received help from friends in recording receipts and expenses. Petitioner asked Mrs. Kyle if she needed the records in *623 preparation of his returns and she indicated that the sheet of paper provided would be sufficient. Petitioner destroyed all the records contained in the cardboard box. He destroyed some records during periods of extreme emotional strain, and later he destroyed or threw away the others while clearing out his basement. Interest Income.
Petitioner agrees that he failed to report interest income for the years in issue as follows: Year
Per Return
Corrected
Unreported
1971
$2,765.52
$10,079.94
$7,314.42
1972
2,260.94
12,478.69
10,217.75
1973
3,080.92
16,903.12
13,822.20
1974
2,251.97
19,493.60
17,241.63
1975
1,890.79
20,166.66
18,275.87
$12,250.14
$79,122.01
$66,871.87
Rental Income.
During the years 1972 through 1975 petitioner received rental income from property leased at 25 Elm Street in Madison, New Jersey. Petitioner did not report any rental income or expenses on his 1972 through 1975 returns. Petitioner agrees that his net profit from rental activity was as follows: 1972
$1,095.97
1973
1,077.00
1974
1,046.38
1975
1,028.27
Total
$4,247.62
Capital Gains - Stock.
During the years 1971 through 1975 petitioner bought and sold stocks through several different brokerage firms. Petitioner did not report any of these transactions *624 on his returns for the years in issue. Petitioner agrees that he had a short term capital gain in the amount of $446.15 for the taxable year 1975. Capital Gain - Real Estate.
In his notice of deficiency respondent made an adjustment with respect to property sold by petitioner in 1972. Petitioner purchased one parcel of land in 1966 for $4,500 and an additional parcel in 1970 for $30,000. On November 29, 1972, petitioner sold both parcels of land to Meriden Development Co. for a sales price of $100,000. Petitioner received a check in the amount of $97,900 and deposited it into his business checking account. Petitioner did not report this transaction on his 1972 return. Petitioner now agrees that this was a taxable transaction which should have been reported on the 1972 return. However, petitioner alleges that his basis in the land purchase was in excess of that allowed by respondent because of improvements made. Respondent calculated the capital gain as follows: Sales Price
$100,000
Less: Legal & Filing fees
2,100
97,900
Less: Cost basis
34,500
Capital Gain
63,400
Section 1202 Deduction
31,700
$31,700
Schedule C Income. Petitioner made deposits to his checking account at the American National *625 Bank and Trust. The total deposits exceeded the amount of Schedule C income reported on his returns for the years in issue. Business receipts for his cinder block business were deposited to his checking account at the American National Bank and Trust Company, account number 062-735-328-7, during the taxable years in issue.The gross deposits, nontaxable deposits and net deposits for the taxable years in issue were as follows: Nontaxable
Net
Year
Gross Deposits
Deposits
Deposits
1971
$116,037.48
$817.62
$115,219.86
1972
209,911.45
101,238.00
108,673.45
1973
221,360.20
73,315.60
148,044.60
1974
69,088.00
20,913.35
48,174.65
1975
49,372.16
16,850.00
32,522.16
$665,769.29
$213,134.57
$452,634.72
Petitioner agreed that he received the following amounts of income from the sale of cinder blocks: Customer
1971
1972
1973
1974
1975
Asbestos Trans.
$180.00
$3,169.00
Amabile Bros.
19,195.57
23,493.41
18,121.40
26,229.80
15,240.09
S. Cerbo & Sons
3,675.49
4.642.37
4,267.10
3,259.00
4,779.76
S.J. Cerciello
1,253.08
178.81
23.00
Flemington Block
34,837.42
68,158.48
9,417.00
Hib Construction
15.00
Richard Delaney
897.06
Piller Construction
1,957.87
1,048.97
Structural Stone
2,697.00
7,087.10
2,973.00
5,776.80
7,561.20
Metro Supply
8,360.03
13,455.14
Total
$28,779.01
$78,599.14
$106,975.12
$44,862.60
$32,734.08
*626 The receipts were deposited into petitioner's checking account at the American National Bank and Trust and into his other savings accounts in the amounts shown below: Deposits Into
Deposits Into
Year
ANB&T
Other Accounts
Total
1971
$28,779.01
$28,779.01
1972
78,599.14
78,599.14
1973
81,541.11
25,434.01
106,975.12
1974
27,656.93
17,205.67
44,862.60
1975
15,063.18
17,670.90
32,734.08
$231,639.37
$60,310.58
$291,949.95 In addition to specifically identified business receipts deposited into petitioner's savings accounts, petitioner also agreed that the following unidentified deposits to his savings accounts represented business receipts: Specifically
Unidentified
Identified
Business
Total
Business Receipts
Receipts
Receipts
Deposited Into
Deposited
Deposited
Year
Savings
Into Savings
Into Savings
1973
$25,434.01
$1,073.33
$26,507.34
1974
17,205.67
17,205.67
1975
17,670.90
1,214.00
18,884.90
$60,310.58
$2,287.33
$62,597.91
It is respondent's position that the net deposits to petitioner's checking and savings accounts represent total business receipts. Thus, respondent computes the understatement of gross business receipts as follows: Understatement
Gross Business
Reported
of Gross Business
Year
Receipts
Business Receipts
Receipts
1971 [4] *627 $115,219.86
$32,694.71
$82,525.15
1972
108,673.45
30,111.16
78,562.29
1973
174,551.94
18,380.72
156,171.22
1974
65,380.32
3,060.00
62,320.32
1975
51,407.06
9,840.41
41,566.65
$515,232.63
$94,087.00
$421,145.63
Unexplained Deposits.
In addition to the deposits into petitioner's checking account, the following unidentified items were deposited to his savings accounts: Date
Amout
April 3, 1973
$21,310.65
April 24, 1973
2,520.00
Total
$23,830.65 The April 3, 1973, deposit is comprised of one check and the April 24, 1973, deposit is comprised of three checks in the amounts of $1,000, $720.00 and $800.00. During the taxable year 1974, petitioner deposited to his bank account the following items: Date
Amount
August 5, 1974
$50,390.50
September 4, 1974
50,377.81
Total
$100,768.31 During the taxable year 1975 petitioner deposited to his savings account at the Orange Savings Bank the following unidentified items: Account No.
Date
Amount
08-30000302
July 8, 1975
$25,364.42
08-0000813
June 4, 1975
5,000.00
08-0000813
June 16, 1975
1,500.00
Expenses.
On his Schedule C for the taxable year 1971, petitioner reported his cost of goods sold in the amount of $15,307.41. He also reported other business expenses in the amount of $16,513.44. [5] The parties have agreed that the total expense for merchandise purchased (cost of goods sold) for the taxable year *628 1971 was $57,969.73. On his Schedule C for the taxable year 1971 petitioner claimed expenses (exclusive of cost of goods sold) as follows: Item
Amount
Insurance
$1,520.19
Truck repairs
3,102.07
Salaries and wages
3,780.00
Licenses for Trucks
1,430.22
Gas and Oil
3,503.04
Tires and tubes
2,119.40
Telephone
452.00
Bridge Tolls
236.00
Miscellaneous tools, forks,
shovels and brooms
174.00
Total other business expenses
$16,316.92
(as corrected) Thus, respondent's position is that petitioner is entitled to total business expenses of $74,286.65 for 1971 ($57,969.73 + $16,316.92). At trial, petitioner produced cancelled checks and testimony relating to certain of these expenses. The amounts of the cancelled checks are set forth as follows: Item
Amount
Insurance
$504.00
Truck repairs
7,221.19
Salaries and wages
5,698.59
Licenses for Trucks
1,301.00
Gas and Oil
6,611.22
Tires and tubes (see truck repairs)
Telephone
596.44
Bridge Tolls
Miscellaneous
[6] *629 761.53
$22,693.97
With respect to the taxable years 1972 through 1975, the parties agree that petitioner is entitled to cost of goods sold and other business expenses as follows: Total Expenses
Expenses
Additional
Agreed to by
Year
Per Return
Expenses
the parties
1972
$31,305.05
$48,057.16
$79,362.21
1973
18,904.86
88,206.49
107,111.35
1974
3,445.40
48,065.89
5u,511.29
1975
9,576.15
27,312.61
36,888.76
Respondent computes petitioner's taxable income from his cinder block business for the years in issue as follows: 1971
1972
1973
1. Receipts:
$115,219.86
$108,673.45
$174,551.94
2. Less Receipts
Per Return
32,694.71
30,111.16
18,380.72
3. Understated
Business
Receipts
82,525.15
78,562.29
156,171.22
4. Less: Deductions
verified
74,286.65
79,362.21
107,111.35
5. Deductions
Per Return
31,820.86
31,305.05
18,904.86
6. Additional
Deductions
42,465.80
48,057.16
88,206.49
Understated
Income From
Business
$40,059.35
$30,505.13
$67,964.73
(line 3 less
line 6)
1974
1975
1. Receipts:
$65,380.32
$51,407.06
2. Less Receipts
Per Return
3,060.00
9,840.41
3. Understated
Business
Receipts
62,320.32
41,566.65
4. Less: Deductions
verified
51,511.29
36,888.76
5. Deductions
Per Return
3,445.40
9,576.15
6. Additional
Deductions
48,065.89
27,312.61
Understated
Income From
Business
$14,254.43
$14,254,04
(line 3 less
line 6)
Cash *630 Hoard.
Petitioner's father and mother died in 1938 and 1960, respectively. Petitioner and his brother Frank were executors of his mother's estate. The New Jersey Inheritance Tax return of Elizabeth Simonelli reflected real property valued at $76,800 and personal property valued at $1,667.54, or a total estate valued at $78,467.54. The return did not list any undeposited cash owned by Mrs. Simonelli at her death. Schedule C of the New Jersey Inheritance Tax return gave negative answers to the following questions: (1) Did decedent, within three years of death, transfer property valued at $500.00 or more, without receiving full financial consideration? (2) Did decedent, at any time, transfer property, reserving (in whole or in part) the use, possession, income or enjoyment of such property. * * * (4) Did decedent, at any time, transfer property, the beneficial enjoyment of which was subject to change because of a reserved power to alter, amend or revoke or which could revert to decedent under terms of transfer or by operation of law? Petitioner was listed as beneficiary of his mother's estate with his reported interest as $43,700. Petitioner signed the return as co-executor under *631 penalties of perjury that all property owned by decedent was disclosed. Petitioner contends that sometime in 1958 his mother took him down to the basement of the house and showed him a metal can described as an "ice cream can." In the can was money, silver, and jewelry. According to petitioner his mother said "this is all going to belong to you. I'm giving it to you because I'm getting --I'm old, I'm up in age, I don't feel well and I don't think I'm going to be around much any longer * * * you're going to need this money." Petitioner claims to have counted the money at a later date and found that it amounted to $362,000. Petitioner alleges that some of this money was deposited to his various bank accounts during the period of 1971 through 1975. Specifically two deposits, one on April 2, 1973, in the amount of $21,318.65 and a second deposit on July 8, 1975, in the amount of $25,364.42, are alleged to be deposits from the cash hoard. [7]
Petitioner also presented three witnesses who allegedly saw the cash hoard in the basement of petitioner's home. None of the witnesses had any idea *632 as to the amount of money contained in the metal can. OPINION 1. The Deficiencies.
The first issue for consideration is whether petitioner received unreported taxable income for the years in issue as determined by respondent. With respect to respondent's determination that petitioner understated income from his sand and gravel business we find, at the outset, that respondent's use of the bank deposits method in reconstructing income was fully justified. In this case, petitioner failed to provide any business records to the respondent's agent upon the examination of his return. [8] *634 Respondent resorted to an analysis of petitioner's business checking account and savings accounts. Respondent was able to specifically identify many of the deposits as business income. Respondent also included certain unidentified deposits as income. The remaining unidentified deposits in issue are as follows: Type & Number
Bank
Date
Amount
Of Items
American Nat'l Bank
4/3/73
$21,310.65
One Check
Acct. No. 065-43348-4
4/24/73
2,520.00
Three Checks
Midlantic Nat'l Bank
Acct. No. 55-3239-8
8/5/74
$50,390.50
Unknown
9/4/74
$50,377.81
Unknown
Orange Savings Bank
Acct. No. 08-30000302
7/8/75
$25,364.42
One Check
Acct. No. 08-0000813
6/4/75
$ 5,000.00
One Check
Acct. No. 08-0000813
6/16/75
$ 1,500.00
Unknown
*633 Where a taxpayer fails to maintain or provide books and records of his income and expenditures, respondent may reconstruct income by use of the bank deposit method. Goe v. Commissioner,198 F.2d 851 (3d Cir. 1952), affg. a Memorandum Opinion of this Court. The burden is on petitioner to establish that respondent's determination of income in his bank deposit analysis is erroneous. Jones v. Commissioner,29 T.C. 601, 614 (1957). [9] Petitioner on brief takes the position that unexplained deposits do not establish income. Petitioner proceeds to cite a number of cases to support this proposition. While we agree with petitioner's statement that deposits do not necessarily equal income, petitioner cites as authority criminal tax cases or civil cases where respondent has the burden of proof. For example, in York v. Commissioner,24 T.C. 742 (1955) respondent was required to prove fraud because of the expiration of the three year statute of limitations. In criminal cases such as Gleckman v. United States,80 F.2d 394 (8th Cir., 1935), and Holland v. United States,348 U.S. 121 (1954), the government had the burden of proving guilt beyond a reasonable doubt. Thus, recognizing the presumption of correctness in respondent's determination we must determine whether petitioner has in any way satisfied his burden of showing that the bank deposit analysis and respondent's deficiency determination were inaccurate in whole or in part. Petitioner raises four arguments in this regard. The first two relate directly to the bank deposit analysis and the second two arguments to the deficiency determination generally. We will consider each argument separately. a. 1974 Unexplained deposits.
The parties have stipulated that petitioner deposited to *635 the Midlantic National Bank, Account No. 55-3239-8, the following amounts: Date
Amount
August 5, 1974
$ 50,390.50
September 4, 1974
50,377.81
Total
$100,768.31
Respondent included these unexplained deposits as income for the taxable year 1974. Petitioner testified that he had no specific recollection with respect to any unidentified deposits made during 1973, 1974, and 1975. Petitioner referred to "juggling" money around. Petitioner further testified that deposits in such amounts could not come from business receipts since he would never receive such a large amount. [10] On brief petitioner argues that the deposit of $50,390.50 on August 5, 1974, represents the proceeds of commercial paper bought July 25, 1974. He further argues that in August 1974 his acount was charged for $50,000 and on September 4, 1974, his account was credited for $50,377.81. Petitioner concludes that the deposits represent the proceeds of/and rollover of commercial paper and interest. He thus agrees that $390.50 and $377.81 should be taxable as interest income. The parties have stipulated to a document which indicates that petitioner placed an order with the Midlantic National Bank on July 5, 1974, for purchase *636 of commercial paper in the amount of $50,000 at 9 percent for 30 days. The August bank account at Midlantic indicates that not only was a deposit made on August 5, 1974, of $50,390.50 but that the account was charged for $50,000 in August also. The transaction appears to be similar to the September transaction in that there was a deposit of $50,377.81 and also a charge to the account that month of $50,000. Based on our review of these documents we are satisfied that petitioner's analysis is correct. Petitioner has satisfied his burden of showing that the two unidentified deposits made in 1974 are in fact from a nontaxable source. Accordingly, rather *637 than the $100,768.31 being taxable income as determined by respondent, we find that $768.31 is taxable as interest income. [11]
b. Cash Hoard.
Petitioner's general defense to respondent's bank deposit analysis is that substantial deposits were made during the year in issue from the cash hoard contained in the metal can given to him by his mother in 1958. Having carefully reviewed the record including the testimony of various witnesses and exhibits offered, we conclude that petitioner may have received cash from his mother in 1958 contained in the ice cream can. We have serious doubt however that the can contained $362,000 in bills. Absent independent verification we are not inclined to believe testimony of the existence of a substantial cash hoard. Burgo v. Commissioner,69 T.C. 729, 745 (1978); *638 Nicholas v. Commissioner,70 T.C. 1057, 1064 (1978). This is especially true when the defense is raised just before or at trial. United States v. Gay,567 F.2d 1206, 1207 (2d Cir. 1978). A necessary element for petitioner to succeed in his cash hoard defense is to show that amounts of these funds were deposited in the years in issue to offset the unexplained deposits. Petitioner has failed on this point. In his testimony, petitioner referred to two deposits, $21,310.65 in April 1973 and $25,364.42 in July 1975, as possibly being deposits from the cash hoard. In fact the record shows that these two items were deposits of checks rather than cash. [12] Petitioner did not point to any specific deposits of cash in the years in issue from which we could make a finding that substantial amounts of nontaxable deposits were made to his checking or savings accounts. [13] Nevertheless, based on his general testimony that he had "juggled" money around we believe that there may have been some small deposits of cash from cash on hand during some of the years in issue, and accordingly we allow petitioner $1,000 per year for the years 1973 through 1975 inclusive representing nontaxable deposits over *639 and above that allowed by respondent. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). c. Expenses.
Petitioner argues that he should be entitled to an additional deduction of $8,770.64 for business expenses for 1971. Petitioner suggests that he has proven through testimony and cancelled checks a total of $23,527.89 of business expenses. Thus, after deducting the amount originally claimed on the return, the additional amount would be $8,770.64. Respondent suggests that the claimed items may be duplicative of expenses already claimed by petitioner and allowed by respondent. We have carefully reviewed the evidence relating to additional expenses for the taxable year 1971. While we agree with respondent that some of the checks may be duplicative of previously claimed expenses, the total of cancelled checks stipulated by the parties exceeds the $16,316.92 of expenses claimed by petitioner on his return. It appears probable that some of the additional expenses claimed were *640 personal rather than for business. Petitioner's testimony was somewhat vague and confusing on this point. Based on the entire record we are satisfied that petitioner did have additional business expenses in 1971 which were not claimed on the 1971 return. Accordingly, using our best judgment, we allow petitioner an additional $5,000 in business expenses for 1971. Cohan v. Commissioner,supra.
d. Cost Basis on Sale of Real Estate.
The issue is whether petitioner is entitled to $21,000 (or some lesser amount) as an additional cost basis relating to two parcels of land sold in later 1972. The record on this point is lacking in any reliable evidence to support any additional cost basis. Petitioner presented some cancelled checks totaling less than $1,000 allegedly for the cost of topsoil. It is not clear whether these expenditures relate to his cinder block business or to the cost of improvement of land. We conclude that petitioner has failed in his burden of proof on this point. [14] *641 Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
2. Addition to Tax.
a. Fraud (Sec.6653(b)). Having found that there were omissions of taxable income which result in underpayments of tax for the taxable years in issue we must determine whether any part of the underpayments were due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Miller v. Commissioner,51 T.C. 915 (1969); section 7454(a); Rule 142(b). Respondent's burden of proof may be met by the use of circumstantial evidence. Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion, 578 F.2d 1383 (8th Cir. 1978). In this case, respondent relies on a substantial understatement of Schedule C business income and omitted rental and interest income [15] to satisfy his burden of proof. There is no doubt that there is substantial authority which stands for the proposition enunciated by respondent that the consistent understatement of income in substantial amounts over a number of years is persuasive evidence of fraudulent intent to evade taxes. Holland v. United States,348 U.S. 121 (1954). With respect to respondent's *642 assertion that there are substantial amounts of unreported Schedule C business income, we note that to the extent such amounts were not stipulated by the parties, we sustained respondent's use of the bank deposit analysis, at least in part due to petitioner's failure to persuade us of his cash hoard theory. Respondent, to this extent, cannot meet his burden of proof with respect to fraud on the basis of petitioner's failure to discharge his burden of proof with respect to the underlying deficiencies. Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). [16]
Since the understatement of income does not establish fraud but is evidence of fraud ( Stratton v. Commissioner,54 T.C. 255, 284 (1970)), we must determine if there is other evidence to establish fraud, e.g., and actual, intentional wrongdoing with the specific purpose of evading tax. *643 Mitchell v. Commissioner,118 F.2d 308 (5th Cir.1941). As additional evidence of fraud respondent points to petitioner's failure to maintain adequate business records and further the destruction of records. Galant v. Commissioner,26 T.C. 354, 365 (1956). Respondent also points to petitioner's failure to advise his tax return preparer of all his business income and expenses as well as interest and rental income. Respondent finally suggests that petitioner failed to cooperate with agents of respondent during the examination of the return. While we believe that respondent has presented circumstantial evidence which might normally be more than adequate to sustain his burden of proving fraud, there is one important factor that we cannot ignore; that is, evidence relating to petitioner's capacity to formulate the specific intent to defraud. The parties stipulated to a number of medical reports. These reports reveal much about petitioner's mental and physical state. Petitioner was admitted to various hospitals during the period 1971 through 1974. In June of 1972 petitioner was diagnosed as a diabetic. Petitioner was also diagnosed at that time as having "chronic undifferentiated *644 schizophrenia." A diagnosis in May of 1972 also stated that petitioner had a nonpsychotic disorder and psychosis with degenerative disease of the central nervous system. In august of 1972 petitioner was diagnosed as having "agitated depression" with "suicidal ideation." The report indicates that petitioner (patient) thought he was losing money. [17] The August diagnosis referred to the fact that petitioner had been admitted to a psychiatric unit at Morristown Hospital for 3 weeks. He was readmitted to that hospital periodically for psychiatric reasons. He was given electro-convulsive therapy. Petitioner was readmitted to Morristown Memorial Hospital in the fall of 1974 complaining of depression and fatigue. The reports indicate many suicidal thoughts by petitioner throughout the years in issue. The Court had the oppostunity to obtain a first hand view of petitioner at trial. Petitioner has a limited education. There were periods of time during the trial when it appeared that petitioner did not understand the nature of the proceedings. On a number *645 of occasions petitioner was unable to respond to straightforward, basic questions.We are satisfied that petitioner did his best to answer in an honest and forthright manner questions posed to him.The following series of questions and answers illustrate this point. Q. What happened to those records that you kept? A. Well, it's--see when I was coming in and out of the hospital, and my mind wasn't right, I was going beserk. I took the ax one day and I started breaking the table, chair in the house, I broke down a lot of plaster which Mr. Orlando had to come over and repair, but after a year of it was all poured out--I wanted to throw myself from the train. I have four or five guns. I wanted to go uptown and start shooting up the town, a lot of things were bothering me. My head was telling me to do that and I was trying to hurt myself. So they took the guns away from me. In fact, I went up to the Delaware River one day, I put the three guns in the car--three other guns and I threw them in the river. I was going to kill the guy in the gas station. Because -- one time, you know, he'd give me bad gas for me and my truck, I stopped three-- Q. We are just concerned now with your *646 tax return preparations and what happened to those records. A. What--what happened to those-- Q. What happened to those records that you kept? A. My records? Q. Your income tax records, your receipts and the things-- A. I--I said that the business got me sick the more--I worked all my life and I can't even make a living. Things like that was bothering mr. I took the books, threw them in the garbage cans, some I threw a 5 gallon of gas on them. I made a big fire in the yard and I burned them up. Things like that. Q. Did any person ever give you any instructions in record keeping? A. What? Q. Did anybody ever give you instructions in how to keep your records in order to prepare you income tax return? A. Yes. Well these friends of mine used to try to show me how to do it. But, you know, I was never too good with figures. Because I used to go in trances, I used to be good for a little while. I'd be doing pretty good, then I'd go into a shell like, you know. I used to even keep away from the public. I used to want to be alone a lot of times. I didn't want to be near nobody, you know. I was afraid I was going to hurt somebody, cause if they bothered me, my mind wasn't *647 right, you know. We must view petitioner's mental capacity at the time the tax returns were filed in order to determine whether or not he could form a fraudulent intent. See Wilson v. Commissioner,76 T.C. 623 (1981), Supplemental Opinion, 77 T.C. 324 (1981). The tax returns in issue were filed during the years 1972 through 1976. Viewing the entire record as a whole, we have serious reservations about petitioner's ability to have committed fraud in the preparation and filing of his tax returns for the periods 1971 through 1975. Respondent argues that petitioner was a reasonably sophisticated businessman who ran a business, had numerous savings accounts, bought and sold stock, maintained and sold real estate, and had rental property. While it is true that petitioner had a reasonable degree of business acumen it appears that the omissions on the tax returns in issue as well as the process of their preparation are more a reflection of his mental and emotional state than a deliberate and conscious effort to evade taxes. Furthermore, we also view petitioner's destruction of records as a product of his mental disease rather than as a deliberate plan to hide income. When petitioner *648 was contacted by agents of respondent he did not attempt to deceive or obstruct the examination. It was the agent of respondent who advised petitioner of his right to counsel and it was counsel who later apparently advised petitioner not to talk with or meet with agents of respondent because of the criminal investigation.In fact an agent of respondent testified that to the extent petitioner did answer questions the agent did not find petitioner to be evasive. We do not deem such conduct as persuasive evidence of a fraudulent intent. [18]
Since the burden of proof is on respondent to establish by clear and convincing evidence that the understatement of tax is due to fraud, we find the respondent has not satisfied this burden. Hollman v. Commissioner,38 T.C. 251, 259 (1962); Supp. Memo. Opinion, T.C. Memo. 1962-236. *649 b. Negligence (Sec.6653(a)).
In his notice of deficiency with respect to the taxable years 1972 through 1975, respondent determined additions to tax under section 6653(a). Since we have found that the addition to tax for fraud under section 6653(b) is not applicable we must determine whether any part of the underpayment of tax is due to negligence or intentional disregard of the rules and regulations. Since respondent determined the addition to tax under section 6653(a) in his notice of deficiency, such determination is presumed to be correct and the burden is on petitioner to show that the determination is erroneous. Bixby v. Commissioner,58 T.C. 757, 791 (1972). We are satisfied based upon the entire record, including the substantial omission of gross receipts, the omission of interest and rental income, and petitioner's failure to maintain adequate books and records, that petitioner is liable for the addition to tax under section 6653(a). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Respondent asserted the additions to tax pursuant to sec. 6653(b) in his amendment to answer filed September 7, 1983.Thus, for the years 1972 through 1975 the addition to tax under sec. 6653(a) is an alternative to the addition under sec. 6653(b). See sec. 6653(b)(3).↩
3. With respect to the taxable year 1971 the parties agree that section 6501(e)(1) is applicable since petitioner has stipulated to the omission of gross receipts in excess of 25 percent of gross income stated on the return. With respect to the years 1972 through 1975 the parties agree that timely extensions by agreement were executed under section 6501(c)(4).
4. Petitioner does not dispute the understatement of business receipts with respect to 1971.
5. Petitioner agrees that this amount should be $16,316.92 based upon a mathematical correction made by respondent.↩
6. This amount is represented by three checks, one to the State of New Jersey in the amount of $67.85 and two other checks in the amounts of $351.18 and $342.50.
7. Petitioner testified that numerous deposits of this cash hoard were made during the years in issue.↩
8. We note that the parties stipulated to ledger books relating to petitioner's sand and gravel business for the years in issue. These records were not made available to respondent during the examination of the tax returns or prior to the issuance of the notices of deficiency. In fact respondent's agents examined third party records including banks and customers of petitioner to reconstruct income. Furthermore, an examination of the ledger books reveals that they provide no information with respect to amounts of money charged or received by petitioner.
9. See also Mazzoni v. Commissioner,T.C. Memo. 1970-37, affd. 451 F.2d 197↩ (3d Cir. 1971).
10. Petitioner testified that "It was money that I had. I was transferring it from one place to another, like that. My memory ain't that good, you know. I don't remember--if you told me ten things now and I walked outside, by the time I get to the bottom of the elevator, I'll only remember one or two." Petitioner, when asked about the size of the unexplained deposits stated, "No, I never got a check for all the years I been in business for that large sum of money.Never. If I had a check like that, I'd think I'd fly over the moon."↩
11. While the source of the $50,000 purchase order dated July 5, 1974 for commercial paper is unexplained, respondent does not include this transaction as income as part of its bank deposit analysis and accordingly, there is no presumption that such amount represents taxable income. We also note that respondent in reply to petitioner's opening brief does not present any arguments or analysis with respect to the transaction.↩
12. There is nothing in the record to explain how or why the cash may have been converted to checks, assuming that it was a deposit of the cash hoard. ↩
13. Nor is there other evidence in the record of cash deposits.↩
14. We note that petitioner did not even argue this issue on brief. In fact the only mention of this transaction by petitioner is in his reply brief where he objects to respondent's proposed findings of fact.
15. Petitioner stipulated that he received $79,122.01 in interest in aggregate for the years in issue. He reported $12,250.14. Petitioner also conceded that he failed to report net rental income for the years 1972 through 1975, aggregating $4,247.62. ↩
16. See also Pappas v. Commissioner,T.C. Memo. 1981-639↩.
17. Physicians in other medical statements indicated that petitioner reported to them that he believed he was losing money and "broke".↩
18. The parties do not dispute the fact that petitioner was under criminal investigation at this point. Accordingly, petitioner could appropriately exercise his Fifth Amendment privilege against self-incrimination. Hoffman v. United States,341 U.S. 479, 496 (1951); Marchetti v. United States,390 U.S. 39, 48 (1968); Ryan v. Commissioner,568 F.2d 531, 539↩ (7th Cir. 1977).